USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/7/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FLAVIO PELLICCIONI,

Petitioner,

-against-

WILLIAM P. JOYCE, in his official capacity as Acting Field Office Director, New York City Field Office, U.S. Immigration & Customs Enforcement (ICE ERO); ROBERT J. RYAN, in his official capacity as Acting Supervisory Detention and Deportation Officer, ATD/ISAP, New York City Field Office, ICE; and U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

Respondents.

26 Civ. 7127 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Petitioner, Flavio Pelliccioni, petitions for a writ of habeas corpus under 28 U.S.C. § 2241, challenging the lawfulness of the conditions of supervision imposed by Immigration and Customs Enforcement ("ICE"), Acting Field Office Director William P. Joyce, and Acting Supervisory Detention and Deportation Officer Robert J. Ryan (collectively, "Respondents"). *See* Pet. (the "Petition"), ECF No. 1; *see also* Opp., ECF No. 10; Reply, ECF No. 14. Petitioner contends that on August 5, 2026, without due process and in violation of its own procedures, Respondents subjected him to a GPS ankle monitor and geographic restrictions, after previously removing those conditions. *See id.* ¶¶ 77–93.[1] Petitioner seeks relief from the conditions imposed on August 5, 2026, and restoration of the supervision conditions that existed on August 3, 2026. *See id.* at ¶5. For the reasons stated below, the Petition is GRANTED.

[1] In the alternative, Petitioner alleges that Respondents violated the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, 706(2)(A), (D). *See* Pet. ¶¶ 94–98.

## BACKGROUND

Petitioner is a seventy-year-old citizen of the Republic of San Marino. Pet. ¶¶ 3, 6 & Ex. D; Ryan Decl. ¶ 3, ECF No. 8. In August 2025, Italy issued an INTERPOL Red Notice (the "Red Notice"), which is "a request to provisionally arrest a person pending extradition based on a national warrant," identifying Petitioner as "wanted for prosecution" in relation to financial crimes. Reply ¶ 19; Resp. Ex. B, ECF No. 9-2 (Red Notice). On December 22, 2025, ICE arrested Petitioner in New York for allegedly remaining in the United States beyond the period permitted under the Visa Waiver Program. Pet. ¶ 4; Ryan Decl. ¶¶ 8–10. The arrest followed communications between the Rome and New York branches of Homeland Security Investigations ("HSI"), in which HSI Rome "identified Petitioner as a foreign fugitive who had travelled to the United States . . . and was evading the Italian criminal justice system." Ryan Decl. ¶ 5; *see also id* ¶ 6.

ICE transferred Petitioner to Camp East Montana in El Paso, Texas, and detained him there for four months until the Honorable Kathleen Cardone of the Western District of Texas found that his continued detention without bond violated due process. Pet. ¶ 4; Ryan Decl. ¶¶ 11, 20; *see also* Pet., Ex. 1 (W.D.Tex. court order). On April 21, 2026, an immigration judge released Petitioner on bond, permitting "ATD [Alternatives to Detention] at DHS' discretion" and "requir[ing Petitioner] to provide DHS with his passport(s) for DHS to retain during the pendency of his proceedings." Pet., Ex. 2 (bond order). Petitioner returned to New York, where ICE imposed supervision conditions "including continuous GPS monitoring through an ankle-mounted electronic tracking device and a geographic limitation of approximately seventy-five miles." Pet. ¶¶ 34–35; *see also* Pet. Ex. B (Form I-830 reflecting Brooklyn residence); Pet. Ex. C (counsel letter dated July 22, 2026, describing conditions of supervision); Pet. Ex. D (counsel

email mentioning "GPS ankle monitor" and "75-mile travel restriction" in place prior to August 3, 2026).

The parties dispute whether Petitioner has complied with the conditions of supervision while subject to the ankle monitor. Respondents claim that Petitioner failed to appear for a May 8, 2026, interview to "complete ATD enrollment" despite "[m]ultiple attempts . . . to contact Petitioner using the phone number he provided."[2] Ryan Decl. ¶ 23. Petitioner states that he received no notice of the May 8 appointment. Pet. Supp. Decl. ¶ 3, ECF No. 15; *see also* Pet. Ex. D (describing Petitioner's discussion with ICE officers of his "record of compliance" and stating Petitioner "has . . . completed 105 days in the community" "without any known violation"). It is undisputed that ICE issued a form I-340 directing Petitioner to appear on August 3, 2026, and Petitioner complied. Ryan Decl. ¶ 23; Pet. Exs. B, D, G.

By email dated July 22, 2026, Petitioner submitted a written request for removal of the ankle monitor condition or less restrictive conditions of supervision pursuant to 8 C.F.R. § 1236.1(d)(2). Pet. ¶ 37 & Ex. 4. Ryan responded that the issue would be discussed at Petitioner's August 3, 2026 ICE check-in. Third Supp. Decl. Cordobés ¶ 2 & Ex. A, ECF No. 24.

On August 3, Petitioner and his attorney met with two ICE officials, Lionel Wright and Jean Derolus, who are not supervisors. Ryan Decl. ¶ 25; Supp. Decl. Cordobés ¶ 2, ECF No. 16; Ryan Supp. Decl. ¶ 4, ECF No. 19. During the meeting, Wright and Derolus "review[ed]

[2] Respondents' submissions include seemingly contradictory statements about when Petitioner was fully enrolled in ATD, but the Court need not resolve these inconsistencies because the credibility of ICE's contention that Petitioner was noncompliant is not material to the Court's analysis. *Compare* Ryan Decl. ¶ 21 ("On April 23, 2026, . . . Petitioner was successfully enrolled in the ATD program"), *with id.* ¶ 23 ("Petitioner was scheduled for an interview . . . on May 8, 2026 to complete ATD enrollment"), *and id.* (August 3, 2026, meeting was "for the purpose of . . . completing enrollment"), *and* Ryan Supp. Decl. ¶ 6, ECF No. 19 ("In making the August 4, 2026, decision, we . . . considered that Petitioner was never fully enrolled in the ISAP [Intensive Supervision Appearance Program] program with ICE ERO NYC.").

[Petitioner's] record of compliance, age (70) and health concerns." Pet. Ex. D. Contrary to ICE ATD Policy Memorandum No. 24006, which requires supervisors to "review and recommend changes to reporting and ATD requirements," *see* ECF No. 20, Wright granted Petitioner's request without seeking supervisory approval. Ryan Supp. Decl. ¶ 4. Petitioner was told that his ankle monitor would be removed and he would be subject to more lenient travel restrictions. Pet. ¶¶ 41–42 & Ex. D; Ryan Decl. ¶ 25. The officers then sent Petitioner to a separate Intensive Supervision Appearance Program ("ISAP") office where his ankle monitor was removed and an employee "assisted Petitioner in configuring SmartLINK" on his mobile phone. Pet. ¶¶ 44–45 & Exs. 7–8 (SmartLINK calendar and program documents); Third Supp. Decl. Cordobés ¶¶ 7–9.

On August 4, either Assistant Field Office Director Alberto Morales or both Morales and Supervisory Detention and Deportation Officer Robert Ryan decided to reinstate the ankle monitor. *See* Ryan Decl. ¶ 26 ("Morales . . . made the decision to place Petitioner back on an ankle monitor"); Ryan Supp. Decl. ¶ 5 ("The . . . decision to place Petitioner back on GPS monitoring was made by myself and . . . Morales . . . . The final decision was ultimately made by . . . Morales"). The following information was considered in deciding to restore the ankle monitor: (1) "the active . . . Red Notice," (2) "notes [in an internal database] concerning Petitioner's failure to appear as directed," (3) and "the fact that Petitioner had to be called in, pursuant to an I-340." *See* Ryan Supp. Decl. ¶ 6. Respondents do not indicate that they requested the underlying foreign warrant and charging materials prior to relying on the Red Notice, obtained "use authorization" from appropriate authorities, or provided Petitioner with a reasonable opportunity to contest the Red Notice's contents, as required under ICE policy. *See* Reply ¶ 18 (citing ICE Directive 15006.1 §§ 2.1-2.2, 4.3(2)-(8)); Ryan Supp. Decl. ¶ 7

(describing conduct related to the Red Notice without identifying these prerequisite steps, and noting communications with "the Italy attaché" only after the reinstatement of the monitor).

Petitioner was directed to appear on August 5, 2026, at which time the ankle monitor was reattached. Pet. Supp. Decl. ¶ 8. When Petitioner's attorney contacted Respondents with a "written request for explanation and review," Ryan communicated that that Petitioner's GPS had been "removed in error and reinstalled to correct that error." Cordobés Decl. ¶ 4, ECF No. 5-3; Pet. Exs. D, 10. Counsel has since submitted a formal request for review of the reinstatement under 8 C.F.R. § 1236.1(d)(2), *see* Pet. Ex. 10, and Respondents have taken no action on the request. *See* Ryan Decl.

**DISCUSSION**

I. Legal Standards

"A writ of habeas corpus may be granted to a petitioner who demonstrates that he is in custody in violation of the Constitution or federal law." *Persaud v. Ball*, No. 26 Civ. 841, 2026 WL 2069859, at *2 (W.D.N.Y. July 17, 2026) (citing 28 U.S.C. § 2241(c)(3)).[3] "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

Custody is unlawful if it violates the principles laid out by the Supreme Court in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). Under the *Accardi* doctrine, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures," even when those procedures are "possibly more rigorous than otherwise

---

[3] Respondents do not contest that Petitioner's release conditions satisfy the "in custody" requirement of 28 U.S.C. § 2241. *See* Opp. at 8 n. 2.

would be required." *Ruiz*, 415 U.S. at 235. The doctrine's "ambit is not limited to rules attaining the status of formal regulations." *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991). As such, an agency may violate the *Accardi* doctrine by "not follow[ing] its own internal procedures," particularly where the "procedure . . . at issue affects 'the rights or interests of the objecting party.'" *See A.C.R. v. Noem*, 809 F. Supp. 3d 103, 125–26 (E.D.N.Y. 2025) (citing *Montilla*, 926 F.2d at 167).

Such internal procedures may include ICE directives. *See Molina v. Joyce*, No. 25 Civ. 1844, 2026 WL 1893736, at *8 (S.D.N.Y. July 1, 2026) (analyzing whether ICE complied with an internal policy directive for *Accardi* purposes); *Banegas v. Bondi*, No. 26 Civ. 0063, 2026 WL 473162, at *2 (W.D. Wis. Feb. 19, 2026) (granting writ of habeas corpus based on respondents' "violation of *Accardi* for failure to comply with an [ICE directive] that plainly affects individual rights"); *de Leon v. Ladwig*, No. 25 Civ. 1884, 2026 WL 19095, at *8 (W.D. La. Jan. 2, 2026) (ordering respondents to show cause why petitioner should not be released because "[i]f [petitioner's] continued detention and denial of parole do not comport with the policy set forth in [an ICE directive], then the [c]ourt must require [r]espondents to abide by their own policy"); *Ixchop-Perez v. Barr*, 821 F. App'x 690, 695 (9th Cir. 2020) (unpublished).

Courts routinely grant habeas petitions based on findings that the Respondent agency violated the *Accardi* doctrine. *See, e.g., Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 163–64 (W.D.N.Y. 2025); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 144–45 (W.D.N.Y. 2025)

II. Application

The August 5, 2026, reinstatement of Petitioner's ankle monitor and associated restrictions was unlawful because it violated ICE's own procedures, namely, ICE Directive 15006.1.

ICE Directive 15006.1, governing the use of INTERPOL Red Notices in immigration proceedings, is within the scope of the *Accardi* doctrine. It "instructs ICE not to rely exclusively on a [Red] Notice, requires supervisory approval, calls for a USNCB request for underlying documents such as the foreign warrant and charging materials, requires use authorization, and directs personnel to provide underlying material as appropriate and a reasonable opportunity to contest the Notice or its contents." Reply ¶ 18 (citing ICE Directive 15006.1 §§ 2.1-2.2, 4.3(2)-(8)). By establishing "safeguards" to protect Petitioner from enforcement action based on a document with potential "reliability concerns," *id.*, Directive 15006.1 governs whether and how the agency may proceed in enforcement actions. Such requirements affect Petitioner's "rights or interests." *Montilla*, 926 F.2d at 167; *see also A.C.R.*, 809 F. Supp. 3d at 125–26 (reasoning that ICE policy, which provided that certain individuals were automatically considered for deferred action on immigration enforcement, affected those individuals' rights or interests and was subject to *Accardi*).

This is so despite Directive 15006.1's disclaimer that it does not create enforceable rights. *See* Reply ¶ 18 (noting that ICE Directive 15006.1 § 9 "expressly disclaims" "a freestanding private cause of action"). "Respondents cite no case law that would compel the conclusion that agencies can avoid application of *Accardi* by simply disclaiming any binding effect in the directive itself. To find otherwise would render the teachings of *Accardi* and its progeny meaningless." *Abdi v. Duke*, 280 F. Supp. 3d 373, 389 (W.D.N.Y. 2017), *vacated in part on other grounds sub nom. Abdi v. McAleenan*, 405 F. Supp. 3d 467 (W.D.N.Y. 2019); *see also Ixchop-Perez*, 821 F. App'x at 695 ("Although the ICE directive disclaims the provision of any rights or benefits, the *Accardi* doctrine can extend to practices for which the agency disclaims binding effect.").

The record demonstrates that, in contravention of Directive 15006.1, ICE "rel[ied] on the [Red] Notice" without completing the steps required under ICE policy before the agency could permissibly consider it, such as requesting the underlying charging materials and providing an opportunity to contest the Red Notice. *See* Reply ¶ 18 (quoting ICE Directive 15006.1); *see* Ryan Supp. Decl. ¶ 6 ("In making the August 4, 2026, decision [to re-attach the ankle monitor], we relied on information . . . which included the active Interpol Red Notice."); *see id.* ¶ 7 (discussing ICE conduct with respect to the Red Notice without identifying any actions taken to request underlying documentation or use authorization, or to provide Petitioner with an opportunity to contest its contents).

The Court additionally notes its concern that Respondents may have committed a separate violation of ICE Directive 15006.1 by "rely[ing] exclusively on a [Red] Notice," which is prohibited regardless of whether the agency undertakes the steps required by the directive. *See* Reply ¶ 18 (quoting ICE Directive 15006.1 §§ 2.1-2.2, 4.3(2)-(8)). Although Respondents cite noncompliance with supervision conditions as another factor motivating reinstatement of the ankle monitor, *see* Ryan Supp. Decl. ¶ 6, Petitioner's testimony that he never received notice of the May 8 appointment and factual inconsistencies concerning the purported noncompliance undermine the credibility of this justification. *See* Pet. Supp. Decl. ¶ 3 (attesting to lack of notice); *see also infra* at 6 n.2 (detailing apparent inconsistencies). Because the Court concludes that Respondents violated ICE Directive 15006.1 by relying on the Red Notice without taking the prerequisite steps under Directive 15006.1, the Court need not reach whether Respondents "exclusively" relied on the Red Notice.

Because ICE's conduct violated ICE Directive 15006.1, and, therefore, the *Accardi* doctrine, Petitioner is entitled to be released from the supervision conditions imposed on August

5, 2026. *See Kurzdorfer*, 794 F. Supp. 3d at 154 (granting habeas relief based in part on *Accardi* violations).[4]

**CONCLUSION**

For the reasons stated above, the Petition is GRANTED.[5] By **October 9, 2026**, the government shall remove Petitioner's ankle monitor and 75-mile geographic restriction and otherwise restore the supervision conditions in place prior to the August 5, 2026 unlawful reinstatement. By **October 9, 2026**, at **11:59 p.m.**, the government shall certify compliance with this order by letter filed on ECF.

SO ORDERED.

Dated: October 7, 2026
New York, New York

ANALISA TORRES
United States District Judge

[4] ICE's contention that the August 3 removal of the ankle monitor was "erroneous" does not give the agency carte blanche to act unlawfully when rectifying its error. *See Aurecchione v. Falco*, 22 Civ. 4538, 2023 WL 6255529, at *11 (S.D.N.Y. Sept. 25, 2023) (reasoning, in the due process context, that a plaintiff who is "erroneously" released from prison and alleges facts 'that support a liberty interest' . . . is entitled to 'some kind of process before re-incarceration'" (quoting *Hurd v. D.C.*, 864 F.3d 671, 683 (D.C. Cir. 2017)).

[5] Because the Court resolves the petition on *Accardi* grounds, the Court need not address Petitioner's arguments under *Mathews v. Eldridge*, 424 U.S. 319 (1976), or the APA.